Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| Father Christopher Collins as Next Friend of, A.D.C.Q., A.S.C.R., A.W.C.C., R.J.L.B., D.L.M.G., X.M.G., I.N.S.A., Z.A.G.S.H., N.J.V.E., and I.L.Z.R., | Case: <br><br> Division: <br><br> **CLASS ACTION COMPLAINT** |
| Plaintiffs, | Personal Injury in Excess of Twenty-Five Thousand Dollars |
| v. | **JURY TRIAL DEMANDED** |
| DOE RUN RESOURCES CORPORATION, A New York corporation, <br>  Serve:      CT Corporation System <br>          120 South Central Avenue <br>          Clayton, MO 63105 | |
| and | |
| D.R ACQUISITION CORP., A Missouri corporation, <br>  Serve:      CT Corporation System <br>          120 South Central Avenue <br>          Clayton, MO 63105 | |
| and | |
| MARVIN K. KAISER, <br>  Serve:      10 N. Kingshighway, <br>          Apt. 10C <br>          St. Louis, MO 63108 | |
| and | |
| ALBERT BRUCE NEIL, <br>  Serve:      129 E. Clinton Place <br>          Apt. 2D <br>          Kirkwood, MO 63122 | |
| and | |
| JEFFREY L. ZELMS, <br>  Serve:      406 N. Point Dr. <br>          Camdenton, MO 65020 | |

1

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

and

THEODORE P. FOX III.,
   Serve:      10 N. Kingshighway,
              Apt. 10C
              St. Louis, MO 63108

   and

RENCO HOLDINGS, INC.,
  A New York corporation,
  Serve:      30 Rockefeller Plaza
             42nd Floor
             Suite 4225
             New York, NY, 10112

 and

THE RENCO GROUP, INC.,
  A New York corporation,
  Serve:      30 Rockefeller Plaza
             42nd Floor
             Suite 4225
             New York, NY, 10112

and

IRA L. RENNERT,
  Serve:      30 Rockefeller Plaza
             42nd Floor
             Suite 4225
             New York, NY 10112

Defendants.

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff, Father Christopher Collins as Next Friend of, A.D.C.Q., A.S.C.R., A.W.C.C., R.J.L.B., D.L.M.G., X.M.G., I.N.S.A., Z.A.G.S.H., N.J.V.E., and I.L.Z.R, by and through undersigned counsel, on behalf of themselves and all other entities and persons similarly situated, sue Defendants DOE RUN RESOURCES CORPORATION, D.R

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

ACQUISITION CORP., MARVIN K. KAISER, ALBERT BRUCE NEIL, JEFFREY L. ZELMS, THEODORE P. FOX III, DANIEL L. VORNBERG, RENCO HOLDINGS, INC., and IRA L. RENNERT, (collectively "Defendants") and for their Complaint allege, upon information and belief and based on the investigation to date of their counsel, as follows:

## INTRODUCTION

*"No safe blood lead level in children has been identified. Lead exposure can affect nearly every system in the body."*

-National Center for Environmental Health, Division of Emergency and Environmental Health Services[1]

Time Magazine has named La Oroya, Peru as one of the 10 most polluted places in the world.[2] This is an action to seek medical monitoring from Defendants for injuries, damages and losses suffered by each and every minor plaintiff named herein, who were minors or *in utero* at the time of their initial exposures and injuries as a result of exposure to the release of lead and other toxic substances from Defendants' ownership, use, management, supervision, storage, maintenance, disposal and release of materials containing lead and other toxic substances from the lead smelter owned and/or operated by the Defendants in the region of La Oroya, Peru. At critical times during gestation and/or their developmental years and to the present, the minor plaintiffs were exposed to damaging levels of lead and other toxic substances. This is a class action complaint seeking medical monitoring as result of exposure for these minor plaintiffs and others similarly situated.

---

[1] http://www.cdc.gov/nceh/lead/ (Accessed 9/19/2016)
[2] Walsh, Bryan, *The World's Most Polluted Places,* Time Magazine, 2007

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

## THE PARTIES

**PLAINTIFFS**

1.      The Court has entered an Order appointing Father Christopher Collins as Next Friend in other individual cases filed before this court against the same Defendants on behalf of other individual Plaintiffs who were injured as a result of the operations of the lead smelter owned and/or operated by Defendants in La Oroya, Peru.

2.      All of the minor Plaintiffs have lived or were *in* utero in the region of La Oroya Peru during relevant times, for the purpose of prosecuting the claims alleged herein.

3.      Plaintiff's Next Friend Father Christopher Collins is and at all relevant times herein has been a resident of the City of Saint Louis, Missouri.

**DEFENDANTS**

4.      Defendant The Doe Run Resources Corporation ("Doe Run") is an international natural resource company focused on mining, smelting and fabrication of metals. At all relevant times, Doe Run was a New York corporation with its principal place of business in St. Louis, Missouri. At all relevant times, Defendant Doe Run owned, and either directly or through other Defendants, operated, used, managed and supervised, the La Oroya metallurgical complex (the "La Oroya Complex") which stored, maintained, or controlled various properties, including a lead smelter, and the waste on such properties. The La Oroya Complex also stored materials containing lead and other toxic substances released from the complex. Upon information and belief, Doe Run is the second largest lead producer in the world and has reported profits in the 100's of millions of dollars.

5.      Defendant Doe Run wholly owns Doe Run Cayman, Ltd., a Cayman Island corporation, which owns Doe Run Peru.

6.    Doe Run Cayman Ltd. has no operations separate from "owning" Doe Run Peru.

7.    At all times relevant hereto, Defendant Doe Run owned and operated Doe Run Peru.

8.    Defendant D.R. Acquisition Corp. is and at all times relevant herein was a Missouri corporation with its principal place of business in Missouri. D.R. Acquisition Corp. owns 100% of Doe Run.

9.    Defendant Renco Holdings, Inc. and Defendant Renco Group, Inc. (collectively "Renco") are and at all times relevant herein were New York corporations with their principal places of business in New York. At all relevant times, Defendant Renco has been the owner of Defendant D.R. Acquisition Corp. and is the current owner of Doe Run Peru.

10.    Defendant Ira L. Rennert is a resident of the City of New York, State of New York. At all times relevant hereto, Defendant Rennert is and was a director, officer, and agent of Defendant Renco and Defendant Doe Run and the controlling owner of all the corporate defendants.

11.    Defendant Marvin K. Kaiser is a resident of the City of St. Louis, State of Missouri. From the time of Doe Run's purchase of the metallurgical complex until approximately February 2006, Defendant Kaiser was an officer and agent of Defendant Doe Run.

12.    Defendant Albert Bruce Neil is a resident of the City of Kirkwood, State of Missouri. From approximately 2003, Defendant Neil was and continues to be an officer and agent of Defendant Doe Run.

13.    Defendant Jeffery L. Zelms is a resident of the City of Camdenton, State of Missouri. From the time of Doe Run's purchase of the metallurgical complex until approximately April 2006, Defendant Zelms was an officer and agent of Doe Run.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

14.      Defendant Theodore P. Fox III is a resident of the City of Eureka, State of Missouri. From approximately September 2006, Defendant Fox was and continues to be an officer and agent of Doe Run.

**FURTHER IDENTIFICATION OF THE DEFENDANTS**

15.      Defendants Doe Run and Renco purchased the La Oroya metallurgical complex in 1997.

16.      As owner of the La Oroya metallurgical complex, Doe Run is liable for the activities and the toxic environmental releases from the complex since the date Defendants' purchased the complex, October 24, 1997.

17.      At relevant times, Doe Run Peru was an agent of the Defendants. Defendants consented, expressly or impliedly, to Doe Run Peru acting on its behalf and Doe Run Peru was subject to Defendants' exclusive control. Doe Run had the right to control and did control the operations, storage, generation, handling, disposal, and release of toxic and harmful substances that led to the minor plaintiffs' injuries. Such control occurred, upon information and belief, solely from the States of Missouri and New York in the form of decisions, orders, policies and requirements communicated to Defendants' agents in La Oroya, Peru.

18.      Defendant Doe Run is the second largest total lead producer in the world and has reported profits in the 100's of millions of dollars during relevant times. Doe Run is an international natural resource company based in St. Louis, Missouri and focused on the mining, smelting, recycling and fabrication of metals.

19.      Defendants owned, operated, maintained, managed and/or used the La Oroya metallurgical complex and related operations and facilities, or acted in conspiracy with each other defendant and continue to do so in a way that negligently, carelessly and recklessly generated,

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

handled, stored, released, disposed of, and failed to control and contain the metals and other toxic substances used and generated by the complex, resulting in the release of toxic metals and gases and other toxic substances onto and around the properties on which minor plaintiffs have in the past and/or continue to reside, use and visit, and/or were exposed, and purposefully withheld information and/or deliberately deceived the minor plaintiffs with regard to the dangers of such exposures, resulting in toxic exposure to minor plaintiffs.

20.     Defendant D.R. Acquisition Corp., a wholly owned subsidiary of defendant Renco, owns 100% of Defendant Doe Run's common stock, both voting and non-voting. There is no established public trading market for these shares. All (100%) of Doe Run's issued and outstanding common and preferred stock is directly or indirectly owned by Renco through D.R. Acquisition Corp.

21.     Renco is owned by Defendant Rennert who serves as Renco's Chairman and Chief Executive Officer, for himself and members of his family. As a result of such ownership, Defendant Rennert controls Doe Run and its subsidiaries.

22.     At all times relevant hereto, Defendant Renco was and continues to be a corporation organized and existing by virtue of law doing business as the Doe Run Company. Defendant Renco owned, operated, and managed Doe Run by and through its agents, servants, and employees acting within the course and scope of their employment, service, and agency and continues to do so. As owner of Doe Run, Renco is liable for the activities and the toxic environmental releases from the La Oroya metallurgical complex since the date Defendants' purchased the complex, October 24, 1997.

23.     Each of the corporate Defendants owned, operated, used, managed, supervised, and/or controlled the La Oroya complex and related operations and facilities in La Oroya and/or

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

was a partner in or the legal and beneficial owner of the partnership interest in a general partnership known as the Doe Run Company, which is a fictitious name used by the partnership. As owners, operators and/or partners in the Doe Run Company, the corporate Defendants are jointly and severally liable for acts and releases related to the La Oroya complex and related operations and facilities.

24.    Some or all of the corporate Defendants, pursuant to various written agreements, including the various Doe Run partnership agreements as amended and restated, expressly or impliedly assumed liabilities arising out of the operation of the La Oroya complex and related operations and facilities since October 24, 1997. In addition and alternatively, all of the Defendants acted jointly and in conspiracy with each other. The objectives of the conspiracy included the failure to adequately control the emissions from Defendants' metallurgical complex and related operations and facilities that Defendants knew were being transported to properties on which minor plaintiffs have and/or continue to reside, use or visit, and/or not to implement adequate pollution controls at Defendants' metallurgical complex and related operations and facilities, and or and purposefully concealing information and/or deliberately deceiving the minor plaintiffs with regard to the dangers of such exposures, with the purpose of the cost and reduction of profits, bonuses and the value of wages, stock, and/or stock options of Doe Run as well as the corporate Defendants.

25.    The corporate Defendants, while located in the States of Missouri and/or New York, exert complete control, not merely stock control, but complete domination of finances, policies, and business practices of Doe Run Peru. The control is so complete that the subsidiary has never had a separate mind, will, or existence of its own. Defendants control environmental expenditures, production practices, use of technology that would limit emissions, and policies including public relations policies and decisions regarding warnings given to minor plaintiffs. Such

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

control is used by Defendants to make substantial profit while causing injuries to the minor plaintiffs, constituting fraud and injustice that violates the minor plaintiffs' legal rights. This unjust use of control proximately caused the minor plaintiffs' injuries.

26.     At all times, Defendants were acting by and through its partners, subsidiaries, agents, servants, and employees who were acting within the scope of their partnership, agency, or employment and in conspiracy with each other.

27.     As a direct and proximate result of the releases by Defendants, minor plaintiffs have suffered injuries, currently suffer and will continue to suffer damages and losses which include but are not limited to physical and psychological injuries, learning and other permanent disabilities, pain, mental anguish, emotional distress, the loss of household services, the cost of medical, educational and rehabilitation expenses and other expenses of training and assistance, and loss of earnings, income, and earning capacity. Such injuries, damages and loses are reasonably likely to continue to occur in the future.

## JURISDICTION

28.     This Court has personal jurisdiction over all parties.

29.     The acts and omissions complained of in this action occurred in this State by Defendants and employees and officers of the corporate defendants, all acting within the course and scope of their agency and employment in this state.

## VENUE

30.     Venue is proper pursuant to §508.010 RSMo (2014).

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

## FACTUAL ALLEGATIONS

31.    The town of La Oroya is located in the central Andean highlands of Peru, at an elevation of 3,750 meters above sea level.  It lies at the confluence of the Mantaro and Yauli rivers, 185 km northeast of Lima in the department of Junín.

32.    In 1922, the privately owned Cerro de Pasco Copper Corporation established the La Oroya Complex for copper smelting and refining. Cerro de Pasco added a lead smelter and refinery in 1928, a sulfuric acid plant in 1939, a silver refinery in 1950, and a zinc refinery in 1952.

33.    The Complex comprises four key circuits. These circuits are the copper smelter and refinery (the "Copper Circuit"); the lead smelter and refinery (the "Lead Circuit"); an anode residue plant and silver refinery (the "Precious Metals Circuit"); and zinc roasting plant, leaching and purification plant and refinery (the "Zinc Circuit," and collectively the "Circuits.")

34.    The Complex also includes numerous other facilities designed to process by-products released during the smelting process, including sulfuric acid plants, an oxygen plant, and several pilot plants to recover minor metallic by-products.

35.    The following diagram shows the main facilities in each circuit and the interrelationships between the four circuits:

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM



36.     Because smelters process concentrates to create a pure ore by burning-off and/or separating out unwanted impurities, it is very difficult to control emissions of such substances.

37.     This is true of any smelter, but the La Oroya Complex faces particular challenges in this regard because the integrated smelting processes are among the most complex in the world.

38.     Indeed, the La Oroya Complex is one of only four smelting facilities worldwide capable of recovering numerous metals and by-products from complex, poly-metallic concentrates with high levels of impurities.

39.     While most smelters recover only one or two metals and a few by-products from a "clean" concentrate (i.e., a concentrate with a high level of the target metal and a low level of

11

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

impurities), the La Oroya Complex recovers 11 metals (copper, zinc, silver, lead, cadmium, indium, bismuth, gold, selenium, tellurium, and antimony) and numerous by-products (e.g., zinc sulfate, copper sulfate, sulfuric acid, arsenic trioxide, zinc dust, and zinc-silver concentrates) from the poly-metallic concentrates produced by the central Andean mines.

40.    The composition of the concentrates processed at the Complex has major implications for its design and operation and for its potential environmental impacts.

41.    The Complex's four circuits (copper, lead, precious metals, and zinc) are integrated so as to allow by-products and intermediary substances produced during the processing of concentrates in one circuit to be further processed and refined in the other circuits, thus maximizing the recovery of valuable metals.

42.    At the same time, the concentrates contain high levels of other substances that either lack economic value or that cannot be fully recovered, including: sulfur, arsenic, and cadmium.

43.    Thus, the process of isolating and refining the target metals creates substantial quantities of by-products, which contain substances that may be harmful to the environment and human health.

44.    In 1974, the Peruvian government nationalized the company and operated the smelter and mine as a state enterprise, Centromin Peru S.A.

45.    In November 1991, the Peruvian Government issued Legislative Decree 708, declaring the promotion of private investment in the mining sector in the national interest and eliminating the exclusive rights that previously had been granted to State-owned mining companies.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

46.     As the Peruvian Government later explained in its official 1999 White Paper[3]:

> Since 1960 the governing criterion was that the best way to promote the economic growth and redistribute their benefits was through the state intervention that allocated resources according to the criteria set by centralized planning.
>
> In contrast, in 1990, the implementation of a set of policies aimed at reducing the economic role of the State as well as to increase private sector activity assumes even greater importance.
>
> From that time on, there was a significant change in the role of the State starting to create the necessary conditions to attract foreign investment and, in parallel, to design a privatization policy aimed at ensuring that the private sector is the dynamic engine of the economy.

47.     A 1992 Resolution included Centromin in the privatization process. Peru created a special committee to oversee Centromin's privatization (Comité Especial de Privatización), including the sale of the La Oroya Complex (the "Special Privatization Committee" or "CEPRI").

48.     At the same time, the Peruvian Government began to implement a modern environmental legal framework.

49.     The new Environmental and Natural Resources Code (enacted in September 1990) imposed several general requirements on mining and metallurgical companies, including obligations to include in their facilities equipment for control of contaminants and to treat wastewaters used in the processing of minerals.

50.     In June 1993, the Peruvian Government issued Regulations for Environmental Protection in Mining and Metallurgy. Article 5 of the Regulations provided that companies operating in the sector would be "liable for any emissions, discharges and disposal of waste to the environment occurring as a result of processes carried out at their installations," and it

---

[3] Government of Peru, White Paper concerning the Fractional Privatization of Centromin, 1999

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

obligated them "to avoid and prevent any elements and/or substances from surpassing the maximum allowable levels" to be issued by the Ministry of Energy & Mines.

51.    The outside consulting firm Knight Piésold advised in its 1996 report to the Peruvian Government that:

   (i)    There was no simple remedy to the existing air quality problem, which extended to lead, SO2 and other particulate emissions.
   (ii)   Any solution would require "detailed engineering evaluation beyond the scope of the present evaluation."
   (iii)  Implementation of adequate controls to meet standards may take "in excess of the ten year implementation schedule being considered by the Peruvian Ministry."
   (iv)   "Considerable flexibility in the implementation and application of new standards will be necessary if La Oroya is to continue as an economically viable operation."
   (v)    "Continued long-term operation of the smelter and progress on privatization can be achieved only if La Oroya is subject to realistic requirements to gradually reduce emissions."

52.    With this knowledge and understanding, Doe Run, part of the Renco Group, purchased the smelter complex in 1997 from the state.

53.    The smelter took the name of Doe Run Peru (DRP) metallurgical complex.

54.    When Doe Run purchased the facility it agreed to improve the facility and lessen its environmental impact.

55.    Doe Run failed to implement the environmental management plan that was a condition of its purchase of the smelter in 1997.

56.    Doe Run received several extensions of time from the Peruvian government to complete the environmental management plan. Despite these extensions, it failed to complete the plan.

57.    In 2002, The National Council for the Environment of Peru reported that Doe Run Peru emitted 3,312 tons/year of particulate matter, 380,136 tons/year of sulfur dioxide, 226

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

tons/year of nitrogen oxides, 847 tons/year of lead, 423 tons/year of arsenic, and 43 tons/year of cadmium.

58.      In November 2005, the Centers for Disease Control (CDC) in Atlanta analyzed blood and urine samples of two population samples, one from La Oroya, the study site, and one from Concepcion, the control site. These results indicated that 97% of children between six months and six years of age and 98% of children between seven and 12 years had elevated blood lead levels, in some cases three or four times the level of concern. According to the CDC, an elevated level is any level equal to or greater than 10 µg/dl in 2005 and now is 5 µg/dl.

59.      Doe Run halted operations at the facility in 2009 when it was unable to access financing as a result of environmental requirements for the site.

60.      The operation of the Doe Run facility has, by this point, harmed tens of thousands of people spanning decades and generations of families.

61.      The minor plaintiffs in this case live or have lived in or around La Oroya, Peru and were exposed to and injured by the harmful and toxic substances released from the Defendants' metallurgical complex.

62.      A group of research scientists from Saint Louis University School of Public Health in Saint Louis, Missouri who have studied La Oroya have concluded that the conditions in La Oroya constitute a public health crisis that poses serious health risks for all population groups and especially for the most vulnerable groups such as infants and young children, including the minor plaintiffs. Beginning in 2005, these public health experts have performed ongoing studies to assess the health effects of environmental contamination produced by Defendants' La Oroya metallurgical complex. The purpose of these studies is to determine the extent of toxic metal exposure suffered by La Oroya residents and the studies have confirmed

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

the gravity of the public health situation caused by Defendants' metallurgical complex. The study performed by Saint Louis University, show that over 99 percent of children in La Oroya have blood lead levels of greater than 10 µg/dl, which is the level considered to be dangerous and to cause permanent injuries.

63.    During the course of their ownership, operation, use, management, supervision, storage, maintenance, and/or control of operations of their metallurgical complex and related properties in La Oroya, Peru, and at all times relevant hereto, the Defendants, while located in the States of Missouri and/or New York, negligently, carelessly and recklessly, made decisions that resulted in the release of metals and other toxic and harmful substances, including but not limited to lead, arsenic, cadmium, and sulfur dioxide, into the air and water and onto the properties on which the minor plaintiffs have in the past and/or continue to reside, use and visit, which has resulted in toxic and harmful exposures to minor plaintiffs.

64.    The air quality level is critical not only because the minor plaintiffs must breathe this polluted air but also because the particulate matter within the air is dispersed in a dust form that enters and settles inside the minor plaintiffs' houses and is deposited on the ground and on all surfaces, including furniture, clothing, water, and crops.

65.    The health effects of lead poisoning are well known. Lead impacts nearly every organ and system of the human body and is not safe at any level. Lead causes multitudinous and serious injuries to the nervous system, which can lead to convulsions, coma and brain death. It causes learning and behavioral disorders, memory loss, nausea, anemia, hearing loss, fatigue, colic, hypertension, and myalgia.

66.    Sulfur dioxide, another pollutant emitted continuously and at an excessive level from Defendants' metallurgical complex, damages circulatory and respiratory system, increases

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

mortality, and is linked to lung cancer, especially when present along with elevated levels of particulate matter, as is the case in La Oroya. Due to the wrongful actions of the Defendants described herein, the level of sulfur dioxide in the air of La Oroya is unreasonably high and dangerous to the minor plaintiffs.

67.     The Saint Louis University study also shows that urine levels of cadmium in residents of La Oroya are at a level that causes injury. Cadmium is a recognized carcinogen. The Saint Louis University study also shows that La Oroya residents have elevated levels of arsenic, another known carcinogen.  Although suitable technologies and processes exist to prevent the pollution caused by the activities at the Defendants' metallurgical complex, such technology has not been implemented by Defendants at their La Oroya Complex.

68.     A recent study by researchers at Yale University found that the Metallurgical Complex of La Oroya (CMLH) exceeded the maximum limits of heavy metals in the air. These high levels were recorded even when the smelter was not operating, between December 2009 and July 2012. Hassan Sipra, a student researcher at the Environmental Protection Clinic at Yale University, found that "[w]hen the [metallurgical] complex was supposedly not operating, there were some records where the maximum permissible limit (LMP) was exceeded."

69.     Lead, cadmium and carbon dioxide exceeded maximum limits of concentration in the air.

70.     The preliminary research of Yale University found that levels of lead in the air were up to three times the maximum limits.

71.     The preliminary research of Yale University found that levels of sulfur dioxide (SO2) in the air exceeded up to 4500 times the maximum limit.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

72.    The preliminary research of Yale University found that levels of cadmium in the air exceeded 45% and the highest recorded level was three times the maximum allowable limit (LMP).

73.    This research used information provided by Doe Run and the medical center of La Oroya between December 2009 and February 2014.

**PLAINTIFFS' EXPOSURE**

74.    The minor Plaintiffs and the class that they represent have all been exposed to lead and/or other toxic substances as a result of the operations of the lead smelter owned and/or operated in La Oroya, Peru, by the Defendants.

75.    Plaintiffs have been exposed through the lead and/or other toxic substances being released into the air, soil, and water in and around La Oroya, Peru.

76.    Plaintiffs, where applicable, have also been exposed *in utero* when the mother carrying the child was pregnant and resided in La Oroya, Peru.

**CLASS ACTION ALLEGATIONS**

77.    Plaintiffs bring this action and seek to certify and maintain it as a class action under Missouri Supreme Court Rule 52.08.

78.    Supreme Court Rule 52.08 mirrors rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure.

79.    Plaintiffs bring this action on behalf of themselves and similarly situated individuals in La Oroya, Peru, subject to amendment and additional discovery as follows: all minor children that currently or have resided in La Oroya, Peru and all minor children born of mothers who were pregnant while residing in La Oroya, Peru since October 24, 1997 ("Medical Monitoring Class").

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

80.    Plaintiffs bring this action on their own behalf and on behalf of the Medical Monitoring Class.

81.    Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any lawyer, law firm member or trial judge who may preside over this cause.

82.    The primary concern underlying the requirement of a class capable of definition is that the proposed class not be amorphous, vague, or indeterminate. *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D. Mo. 1985). In the proposed Medical Monitoring Class, it will be straightforward and definite as to whether an individual is a minor child that has resided in La Oroya, Peru after October 24, 1997.

83.    Under the Supreme Court of Missouri's rules, "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Mo. Sup. Ct. R. 52.08.*

84.    The Federal Rules of Civil Procedure lay out the prerequisites of a class action as follows: (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:(1) the class is so numerous that joinder of all members is impracticable;(2) there are questions of law or fact common to the class;(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

85.    The class action prerequisites under the Federal Rules of Civil Procedure and Missouri's rules of civil procedure mirror one another.

**CLASS MEMBERSHIP**

86.    The requirement of class membership under Mo. Sup. Ct. R. 52.08(a) (mirroring Federal Rule of Rule 23(a)) is generally approached as a requirement that the named plaintiffs have standing to bring suit on behalf of the class. *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D. Mo. 1985).

87.    The Plaintiffs have standing as they are all minor children who have been exposed directly to the lead and/or other toxic substances released from the lead smelter owned and/or operated by the Defendants since October 24, 1997.

**NUMEROSITY**

88.    Mo. Sup. Ct. R. 52.08(a) (mirroring Fed. R. Civ. P. 23(a)(1)) requires that the proposed class be "so numerous that joinder of all members is impracticable."

89.    The joinder of all minor children and minor children born to mothers who resided in La Oroya, Peru while pregnant since October 24, 1997 meets this requirement as it is so numerous as to impracticable.

90.    This class is estimated to be in the thousands of individuals.

**COMMONALITY**

91.    Mo. Sup. Ct. R. 52.08(a)(2) (mirroring Fed. R. Civ. P. Rule 23(a)(2)) further requires that there exist "questions of law or fact common to the class."

92.    There exists both commonality as to law and fact in the present cause.

93.    The commonality of fact centers on the exposure to lead and other toxic substances by the Plaintiffs from the operations of the lead smelter owned and/or operated by the Defendants.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

94.    The common issue of law is the legal need and entitlement of the Defendants for medical monitoring and the associated costs that resulted from this exposure.

**TYPICALITY**

95.    Mo. Sup. Ct. R. 52.08(a)(3) (mirroring Fed. R. Civ. P. Rule 23(a)(3)) states that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class". As a general rule, a named plaintiff's claim will be found typical if it arises from the same event or conduct giving rise to the claims of absent class members or if it is based on the same legal or remedial theory. *In re Tetracycline Cases*, 107 F.R.D. 719, 729 (W.D. Mo. 1985).

96.    The claims of the class representatives are typical of the claims of the class. The class representatives have been exposed to lead and other toxic substances. The class representatives have had their blood tested for lead and lead was present in their blood.

**ADEQUACY OF REPRESENTATION**

97.    Mo. Sup. Ct. R. 52.08 (a)(4) (mirroring Fed. R. Civ. P. Rule 23(a)(4)) states that "the representative parties will fairly and adequately protect the interests of the class."

98.    This prerequisite applies both to the named class representatives and to class counsel. *See Vandyne v. Allied Mortgage Capital Corp.*, 242 S.W.3d 695, 698 (Mo. 2008).

99.    The named Plaintiffs will fairly and adequately represent the class interests for medical monitoring as they are unlikely to develop any conflicts of interest during the pendency of the litigation and are unlikely to develop any interests that will adversely affect the class.

100.    Father Collins, the *next friend,* has visited La Oroya and met with many of the families affected by the heavy metal pollution in the town of La Oroya and surrounding areas.

101.    Father Collins recognized the tragedy of what has occurred in La Oroya and is committed to helping the children however he can.

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

102.    Plaintiffs have retained counsel with substantial experience litigating both environmental torts and class actions, including actions, like this one, representing putative classes who have been exposed to dangerous chemicals and are in need of medical monitoring.

103.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the classes and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to the classes.

**PREDOMINANCE OF COMMON QUESTION**

104.    Plaintiffs bring this action under 72. Mo. Sup. Ct. R. 52.08 (b)(3) (mirroring Fed. R. Civ. P. Rule 23(b)(3)) because there are numerous questions of law and fact common to Plaintiffs and the class members that predominate over any question affecting only individual class members. The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues include:

a.    Whether Defendants owed a duty to Plaintiffs and members of the classes to refrain from conduct reasonably likely to cause contamination of class members environment, including water, soil, and air;

b.    Whether Defendants knew or should have known that it was unreasonably dangerous to operate the smelter in such a way as to cause lead and other toxic substances to be released into the environment;

c.    Whether Defendants' breach of a legal duty caused class members' environment to become contaminated with lead and other toxic substances;

d.    Whether it was foreseeable that Defendants' operation of the smelter would cause class members' environment to become toxic and/or unreasonably dangerous for normal and foreseeable human habitation;

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

e.      Whether Plaintiffs and the class are at increased risk of illness and harm as a result of the lead and other toxic substances that have accumulated in their bodies from living in and being exposed to the to toxic environment in La Oroya, Peru;

f.      Whether medical monitoring is reasonable and necessary to assure early diagnosis and treatment of such illnesses and conditions.

**SUPERIORITY**

105.    Plaintiffs and members of the classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

106.    Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law. Further, without class litigation, class members will continue to incur damages.

107.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**<u>CLAIM FOR MEDICAL MONITORING</u>**

108.    Plaintiffs reallege and reassert all allegations in the preceding paragraphs as if fully restated herein.

109.    It is well established that in Missouri there exists a tort claim for medical monitoring when there has been exposure to a toxic substances. *See Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 716 (Mo. 2007) ("tort law has evolved over the years to allow plaintiffs compensation for medical monitoring. A medical monitoring claim seeks to recover the costs of future reasonably necessary diagnostic testing to detect latent injuries or diseases that may develop as a result of exposure to toxic substances"). In *Meyer*, children exposed to lead sued smelter

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

operators to recover damages for the expense of medical monitoring. The Missouri Supreme Court held that the children were entitled to recover such damages under a "medical monitoring claim." *Id.*

110.    Potential damages sustained by a plaintiff who is exposed to a toxin include the need for medical monitoring for the early detection of disease from exposure and compensation for necessary medical expenses reasonably certain to be incurred in the future rests on well-accepted legal principles." *Id.* at 717 (Mo. 2007).

111.    As a direct and proximate result of the Defendants' acts, omissions, and conduct as set forth in this Complaint, Plaintiffs have suffered and continue to suffer a significantly increased risk of contracting a serious injury or latent disease, including, but not limited to, several forms of cancer, respiratory ailments, gastrointestinal ailments, sleep disturbance, and physical stress. This increased risk makes periodic diagnostic medical examinations reasonably necessary to establish a "baseline" status of the Plaintiffs' health and to monitor their status for changes and progressions in their injuries and their sequelae.

112.    Early detection and diagnosis of these diseases is clinically invaluable as early detection and diagnosis can prevent, reduce, and/or significantly delay resulting discomfort, suffering, disability, and dysfunction, and/or death.  Furthermore, these conditions can often appear asymptomatic absent proper testing until they have progressed to an untreatable, permanent, and/or terminal state.

113.    Easily administered, cost-effective monitoring and testing procedures exist that make the early detection and treatment of such injuries or diseases possible and beneficial.  For example, administration of these readily available non-invasive tests can easily and accurately diagnose the presence of liver failure, respiratory ailments, and heart dysfunction, even in

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM

asymptomatic individuals. Early diagnosis of these diseases and conditions will allow prompt and effective treatment and will reduce the risk of morbidity, and mortality, from which these Plaintiffs would suffer if diagnosis and/or treatment were delayed until their conditions became overtly symptomatic.

114.    The recommended testing procedures will be subject to expert testimony at the time of trial.

115.    Plaintiffs are at a high risk for latent and progressive respiratory injuries and therefore need to undergo testing. Plaintiffs also need the availability of non-invasive testing as a diagnostic tool and method of treatment in order to prevent untreated and unabated progression of latent injuries, which will result in even more grave injuries and consequences.

116.    Plaintiffs' increased susceptibility to certain injuries and the irreparable threat to their future health and well-being resulting from their exposure to hazardous substances and chemicals in and around their homes, schools, businesses and other public places in La Oroya, Peru can only be mitigated and/or addressed by the creation of a medical program.

117.    To the extent that Defendants' actions resulted in the discharge and/or release of toxic contaminants, especially lead, from the operation of the lead smelter in La Oroya, Peru into the air, soil, and water around the Plaintiffs, thereby entering and injuring Plaintiffs' physical and mental well-being, Defendants are jointly and severally liable for all damages from contamination in this case.

### JURY TRIAL DEMAND

Plaintiff and Class Members demand a jury trial as to all claims and issues triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Members of the proposed Class pray that this Honorable Court do the following:

A.   Certify the matter as a class action pursuant to the provisions of Missouri Supreme Court Rule 52.08 and order that notice be provided to all Class Members;

B.   Designate Plaintiffs as representative of the Class and the undersigned counsel as Class Counsel;

C.   Award Plaintiffs and the Class their costs, prejudgment interest, and attorney fees; and

D.   Grant such other relief as is just and proper.

Dated: September 27, 2016

Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

By:___/s/ Sean P. Barth
Sean P. Barth, MO Bar 57015
Paul J. Napoli, *Pro Hac Pending*
Mark Twain Plaza II
103 West Vandalia St., Suite 125
(618) 307-4258
sbarth@napolilaw.com
pnapoli@napolilaw.com

**GORI, JULIAN & ASSOC., P.C.**

By:___/s/ D. Todd Matthews
D. Todd Matthews, MO Bar 52502
Randy L. Gori, MO Bar 47619
156 N. Main St.
Edwardsville, IL 62025
(618) 659-9833
todd@gorijulianlaw.com
randy@gorijulianlaw.com

**RODRIGUEZ TRAMONT + NUÑEZ, P.A.**

By:___/s/ Andrew V. Tramont
Andrew V. Tramont, MO Bar 67632
255 Alhambra Cir., Suite 1150
Coral Gables, FL 33134
(305) 350-2300
avt@rtgn-law.com

Electronically Filed - City of St. Louis - October 04, 2016 - 12:36 PM